MARCELLUS MCRAE, SBN 140308
    mmcrae@gibsondunn.com
ABIEL GARCIA, SBN 289052
    agarcia@gibsondunn.com
DANIEL M. RUBIN, SBN 319962
    drubin@gibsondunn.com
CAROLINE K. MONROY, SBN 329018
    cmonroy@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

Attorneys for Plaintiff
Oscar Enrique Nuñez Euceda

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| Oscar Enrique Nuñez Euceda, | CASE NO. 2:20-cv-10793 |
| Plaintiff, | **COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| United States of America, | |
| Defendant. | |

## **COMPLAINT**

For being forcefully separated and isolated from his children, Plaintiff Oscar Enrique Nuñez Euceda brings this complaint against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) and §§ 2671–2680, stating as follows:

### INTRODUCTION

1.     This case seeks redress for the forced separation of Mr. Nuñez Euceda from his children by the government of the United States when they arrived here seeking asylum. It further concerns the inhumane and cruel treatment of Mr. Nuñez Euceda while he was in the custody of the United States government.

2.     The treatment of Mr. Nuñez Eueda was not an isolated occurrence. Rather, it was the result of an unprecedented policy issued at the highest levels of the federal government.  That policy had one goal: separate parents from their children to deter lawful asylum seekers.  Members of the United States government, from the most senior administration officials to agents stationed at the border, chose to inflict immense emotional pain, suffering, and trauma on parents and their young children in service of their policy objective, which was to deter anyone from seeking asylum at the southern border, especially Central American immigrants.

3.     In May 2018, former Department of Homeland Security Secretary and then Chief of Staff to the President John Kelly callously dismissed concerns about the government's forced-separation policy, remarking that "[t]he children will be taken care of—put into foster care *or whatever*."[1]  The Attorney General at the time, Jeff Sessions, stated that "[w]e need to take away children . . . If [they] care about kids, don't bring them in."[2]  Despite widespread condemnation and a federal-court injunction requiring the government to reunite separated families and stop further separations, President Trump continued to defend the policy as a deterrent to Central American migration, tweeting "if you don't separate, FAR more people will come."[3]

4.     In total, the government has admitted to separating more than 4,200 children from their parents.[4]  This number does not include families that may not have

---

[1]  *Transcript: White House Chief of Staff John Kelly's Interview With NPR*, NPR (May 11, 2018, 8:36 AM), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr (emphasis added).

[2]  Michael D. Shear, Katie Benner & Michael S. Schmidt, *'We Need to Take Away Children,' No Matter How Young, Justice Dept. Officials Said*, N.Y. Times (Oct. 6, 2020), https://www.nytimes.com/2020/10/06/us/politics/family-separation-border-immigration-jeff-sessions-rod-rosenstein.html.

[3]  Donald J. Trump (@realdonaldtrump), Twitter (Dec. 16, 2018, 8:25 AM), https://twitter.com/realDonaldTrump/status/1074339834351759363.

[4]  Leila Rafei, *Family Separation, Two Years After Ms. L*, ACLU (Feb. 26, 2020), https://www.aclu.org/news/immigrants-rights/family-separation-two-years-after-ms-l.

been counted before the *Ms. L.* court's order to account for the separated families.[5] Additionally, thousands of families have been separated since the July 2018 injunction.[6]

5.      Mr. Nuñez Euceda is one of those parents.  The trauma he has endured along with thousands of others was not an incidental byproduct of the separation policy; it was the intended result of that policy.  The government hoped that the psychological trauma it inflicted would deter parents and children from seeking asylum.  This case seeks to hold the government responsible for that policy.

6.      Mr. Nuñez Euceda fled Honduras in May 2018 with his two minor children—his partially-deaf 13-year-old daughter and his 17-year-old son.  They left their homeland because Mara 18 gang members had repeatedly threatened, and then committed, violence against the family.

7.      When Mr. Nuñez Euceda arrived in the United States, immigration officers verbally abused and ridiculed him.  Then they forcibly separated him from his young children when he arrived at the processing center known as the *hielera*.

8.      After being separated from his children, Mr. Nuñez Euceda was transferred to the ICE Port Isabel Service Processing Center ("Detention Center") in Texas where he was put in solitary confinement for at least 14 days.  He received little food throughout the day, was rarely permitted to leave his cell, and received no information about his children's whereabouts.  About a month after arriving in the United States, Mr. Nuñez Euceda was deported back to Honduras without being provided any information about the well-being or location of his children.  He returned back to the dangers of Honduras without having been given an opportunity to say

---

[5]  *See* Office of Inspector General, U.S. Dep't of Health & Human Servs., OEI-BL-18-00511, *Separated Children Placed in Office of Refugee Resettlement Care* 1, 6, 13 (Jan. 17, 2019) (reporting that "thousands of children may have been separated . . . before the accounting required by the Court [in *Ms. L.*]").

[6]  *See* Kids In Need of Defense, *Family Separation: Two Years Later, The Crisis Continues* 4 (July 2020), available at https://supportkind.org/wp-content/uploads/2020/07/Family-Separation-Report-2020-FINAL-2.pdf.

goodbye.

9.     After his deportation, Mr. Nuñez Euceda made the long journey back to the United States to see his children and once again seek asylum.  He was finally allowed to apply for asylum and is currently awaiting his individual hearing.

10.     Since May 2018, Mr. Nuñez Euceda has only been able to see his children once in person.

11.     Separating Mr. Nuñez Euceda from his children, as well as the subsequent solitary confinement, caused him to suffer ongoing stress, depression, and anxiety.  Mr. Nuñez Euceda has great difficulty vocalizing the pain and trauma he suffered during his detention, and he becomes visibly more anxious when he attempts to recall the moment his kids were taken from him.  But that was the point of the government's policy—to traumatize parents like Mr. Nuñez Euceda, and their children, in an effort to deter future, lawful asylum seekers from seeking refuge in the United States.

12.     The separation and mistreatment Mr. Nuñez Euceda suffered at the hands of United States government officials had, and continues to have, crippling effects on his physical, emotional, and mental well-being.  The government's family-separation policy was as cruel and inhumane as it was unlawful.  Accordingly, the United States is liable under the FTCA for the conduct that harmed Mr. Nuñez Euceda.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over Mr. Nuñez Euceda's claim for money damages against the United States pursuant to 28 U.S.C. § 1346(b)(1).

14.     Mr. Nuñez Euceda has exhausted his FTCA administrative claim.  On February 12, 2020, Mr. Nuñez Euceda served by overnight mail and email the relevant United States departments and agencies with all required administrative forms.  The government provided no final disposition of Mr. Nuñez Euceda's administrative claims over the ensuing six months and has failed to respond to Mr. Nuñez Euceda's claims in the interim.  Mr. Nuñez Euceda therefore exercises the option to deem those claims denied pursuant to 28 U.S.C. § 2675(a).

Gibson, Dunn &
Crutcher LLP

4

15.    Mr. Nuñez Euceda resides in Altadena, California, which is within the Central District of California.  Venue is therefore appropriate under 28 U.S.C. § 1402(b).

## PARTIES

16.    Plaintiff Oscar Enrique Nuñez Euceda is a 38-year-old Honduran man, who was separated from his then 13- and 17-year-old children by officials of the United States government sometime in May 2018.

17.    Defendant United States of America is a proper defendant under the FTCA.  28 U.S.C. §§ 1346(b), 2674.  Mr. Nuñez Euceda sues the United States for personal injuries caused by the wrongful acts or omissions of its employees, including employees of the Department of Homeland Security (DHS), its constituent agencies Customs and Border Protection (CBP), United States Citizenship and Immigration Services (USCIS), Immigration and Customs Enforcement (ICE), as well as the Department of Health and Human Services (HHS).  *See* 28 U.S.C. § 2671.  Those employees were acting within the scope of their employment under circumstances where the United States, if a private person, would be liable to Mr. Nuñez Euceda in accordance with the law of the place where the acts or omissions occurred.  28 U.S.C. § 1346(b).

## ALLEGATIONS

### A.    The Government's Family-Separation Policy

18.    In April 2018, the Trump Administration began separating families along the United States' southwestern border with Mexico as part of a "Zero-Tolerance" policy mandating the prosecution of all persons that crossed the border between ports of entry.[7]  The goal of the Administration was to deter lawful asylum seekers, and others, from seeking refuge in the United States by harming families through the

---

[7] *Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry*, Dep't of Justice (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

forcible separation of parents and children.

19.     Administration officials knew that separation would cause enormous trauma to children and parents, and intended to use the publicity regarding that trauma as one aspect of a strategy of deterrence.  On June 19, 2018, acting assistant secretary of HHS Steven Wagner told reporters that "[w]e expect that the new [separation] policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[8]

20.     Indeed, even after a federal judge enjoined the family-separation policy, concluding that separated parents would likely succeed on their claim that the separations were unconstitutional,[9] President Trump continued to promote the deterrent purpose of the policy, telling reporters that "[i]f they feel there will be separation, they don't come."[10]

21.     And, to the surprise of no one, parents and children suffered physically, mentally, and emotionally as a result of the forced separation—just as the Administration planned and expected.  Mr. Nuñez Euceda was no exception.

**B.     Mr. Nuñez Euceda Comes to the United States Seeking Asylum**

22.     On or around May 18, 2018, Mr. Nuñez Euceda entered the United States with his two minor children, his partially-deaf 13-year-old daughter and his 17-year-old son.  They were seeking asylum from gang violence in their native Honduras.

23.     In Honduras, Mr. Nuñez Euceda was brutally attacked by machete-

---

[8]  Philip Bump, *Here Are the Administration Officials Who Have Said That Family Separation Is Meant as a Deterrent*, Wash. Post (June 19, 2018, 9:14 PM), https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent.

[9]  *Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1142–46, 1149 (S.D. Cal. 2018), *modified,* 330 F.R.D. 284 (S.D. Cal. 2019).

[10]  David Shepardson, *Trump Says Family Separations Deter Illegal Immigration*, Reuters (Oct. 13, 2018, 5:44 PM), https://www.reuters.com/article/us-usa-immigration-trump/trump-says-family-separations-deter-illegal-immigration-idUSKCN1MO00C.

Gibson, Dunn & Crutcher LLP

COMPLAINT

wielding members of the deadly Mara 18 gang.  Before resorting to the long, dangerous journey to come to the United States, Mr. Nuñez Euceda and his children first attempted to relocate within Honduras.  In fact, they tried relocating multiple times but each time still faced grave danger as a result of Mara 18's death threats.

24.     Shortly after crossing the border into the United States near Reynosa, Mexico, several CBP agents approached the group Mr. Nuñez Euceda and his children were travelling with.

25.     The CBP agents questioned members of the group and asked Mr. Nuñez Euceda whether he had seen the news about parents crossing into the United States and how they were being separated from their children as punishment.  Mr. Nuñez told the officers that he was fleeing violence in Honduras that had impacted his family.

26.     The agent then informed Mr. Nuñez Euceda that he was going to take Mr. Nuñez Euceda and his children to another officer, who would take them to a nearby Detention Center.

**C.     Government Agents Separate Mr. Nuñez Euceda and His Children**

27.     After the CBP agents detained Mr. Nuñez Euceda and his children, they were loaded into a vehicle and transferred to a nearby holding center, commonly known as a "*hielera*," which means "icebox" in Spanish.

28.     Right after arriving at the *hielera*, an officer told Mr. Nuñez Euceda that his children were going to be taken away from him.  He pleaded with the officer to not take his children away, but to no avail.  At this point, the officer separated Mr. Nuñez Euceda and his children, sending Mr. Nuñez Euceda alone to the cages in the *hielera*. Mr. Nuñez Euceda's children cried as they were taken from their father.

29.     It would be 19 months before Mr. Nuñez Euceda saw his children again. It would be at least a month before Mr. Nuñez Euceda even knew where his children had been taken or who was caring for them.

30.     Over the course of the next month, Mr. Nuñez Euceda would ask various officials, at the *hielera* and Detention Center, about the location and safety of his

children.  Those questions fell on deaf ears.

**D.    Government Agents Mistreat Mr. Nuñez Euceda in the *Hielera***

31.    For roughly a week after government agents took away his children, Mr. Nuñez Euceda was detained in the *hielera*.  During that time he was held in a cell with approximately 70 other men.  It was extremely cramped and crowded, making it nearly impossible to sleep.  He was provided no bedding and due to the over-crowding, Mr. Nuñez Euceda had to sleep on the floor.

32.    During his weeklong confinement, Mr. Nuñez Euceda was given food only once a day, and he was never given an opportunity to shower or to change into fresh clothing.  Compounding these already unsanitary conditions, all detainees were inhumanely made to share just one or two toilets.

33.    During his detention in the *hielera*, Mr. Nuñez Euceda repeatedly told different officials that he wanted to apply for asylum as a result of the violence and trauma he suffered in Honduras.  Every time he raised the issue of applying for asylum he was wrongly told that he was not allowed to apply.

34.    Sometime after being detained at the *hielera*, CBP agents attempted to force Mr. Nuñez Euceda to sign a form—in English, even though Mr. Nuñez Euceda only understands Spanish.  Those agents did not explain what the document said, and they refused to provide Mr. Nuñez Euceda with a Spanish translation of the document. As a result, Mr. Nuñez Euceda refused to sign the document.  A CBP officer responded by threatening Mr. Nuñez Euceda, telling him that if he did not sign he would never see his children again.  At that point, Mr. Nuñez Euceda had not heard anything regarding the safety of his kids in about a week and the threats from the officer made Mr. Nuñez Euceda even more anxious and stress-ridden.

**E.    Government Agents Mistreat Mr. Nuñez Euceda at Port Isabel**

35.    After Mr. Nuñez Euceda's roughly week-long detention in the *hielera*, government agents transferred him to the Detention Center in Los Fresnos, Texas.

Gibson, Dunn & Crutcher LLP

8
COMPLAINT

Although the location had changed, his treatment was just as bad, if not worse.

36.     On his arrival at the Detention Center, the government detained Mr. Nuñez Euceda in solitary confinement for over two weeks.  During that time, he was given very little food, and he was only rarely permitted to go outside.

37.     It is tragically unsurprising that while Mr. Nuñez Euceda was detained at the Port Isabel Detention Center, another detainee informed him that a fellow detainee had committed suicide by hanging.

38.     During his detention at Port Isabel, Mr. Nuñez Euceda filed a number of forms with the guards and federal agents seeking assistance, including basic medical care and information on the whereabouts of his children.  He never received a response.

39.     In fact, Mr. Nuñez Euceda repeatedly asked government officials where his children had been taken.  But they never provided Mr. Nuñez Euceda with any information or a means to contact them.  It wasn't until Mr. Nuñez Euceda returned to Honduras that he was able to find out any information about his children.  Mr. Nuñez Euceda was stricken with constant grief due to the lack of any response from any of the government officials.  Because he had no information about his children's well-being, he was always wondering what had happened to them.

40.     After more than two weeks in solitary confinement at Port Isabel, and a little over a month in the United States, Mr. Nuñez Euceda was briefly transferred back to the *hielera* and then deported to Honduras.  He would end up making the journey back to the United States in order to apply for asylum and to try to reunite with his children.

**F.     The Prolonged Detention of Mr. Nuñez Euceda's Children**

41.     During the period of their initial separation, Mr. Nuñez Euceda was given no information about the treatment, health, safety, or even location of his children, who had been separated themselves.

42.     On information and belief, Mr. Nuñez Euceda's minor son was detained

for approximately three months.

43.     On information and belief, Mr. Nuñez Euceda's partially-deaf minor daughter was detained for approximately seven months.

44.     Not knowing about their whereabouts was a constant source of grief that burrowed deeper into Mr. Nuñez Euceda's consciousness as the days dragged on in his solitary confinement.

45.     Only after Mr. Nuñez Euceda was deported to Honduras was he able to speak to his daughter, who called him about once every two weeks.  She often cried during these phone calls.  She told Mr. Nuñez Euceda that she was "extremely sad" and "didn't want to be where she was."

46.     Mr. Nuñez Euceda's daughter is partly deaf and requires hearing aids. However, on information and belief, his daughter was not provided with adequate hearing aids while she was detained by the government for roughly seven months.

47.     Both children were eventually released to their mother, who lives in North Carolina and has resided in the United States during the entirety of their detention. Federal officials never told Mr. Nuñez Euceda about the whereabouts of his children or provided him with information regarding their health and well-being.  He only learned this information after he was deported and was eventually able to talk to the mother of his children.

### G.     Mr. Nuñez Euceda Is Finally, Albeit Briefly, Reunited With His Children

48.     The separation of Mr. Nuñez Euceda from his children has continued nearly unabated since May 2018—29 months and counting.

49.     After being deported, Mr. Nuñez Euceda eventually made his way back to the United States from Honduras in order to seek asylum.  His asylum case is pending.

50.     Mr. Nuñez Euceda currently resides in Altadena, and one condition of his release from immigration custody is that he cannot travel outside of California without permission.  He received permission from ICE officials to visit his children for one

three-week period in December 2019.

51.     Otherwise, Mr. Nuñez Euceda's separation from his children has been continuous.

**H.     To This Day, Mr. Nuñez Euceda Suffers From the Harmful Effects of the Separation and His Mistreatment at the Hands of Government Officers**

52.     Mr. Nuñez Euceda has suffered greatly from both the prolonged separation from his children and his detention.  He continues to experience physical and psychological harm.

53.     Indeed, during his long and still ongoing separation from his children, Mr. Nuñez Euceda has felt lonely and depressed.  He has suffered, and continues to experience, severe emotional distress.  Whenever Mr. Nuñez Euceda thinks about or is reminded of his detention, he experiences headaches, loses his sense of time, and suffers from attacks of anxiety.

54.     These feelings of depression, anxiety, and stress were heightened by concern for his daughter, who he believes was not given properly functioning hearing aids during her seven-month detention.  That lack of medical care made it extremely difficult for Mr. Nuñez Euceda to communicate with his daughter over the telephone while he was in Honduras and was attempting to return to the United States.

55.     Moreover, Mr. Nuñez Euceda experienced physical pain as a result of his detention in inhumane conditions in both the *hielera* and afterward at Port Isabel.  His time in solitary confinement caused him to suffer severe anxiety and frequent headaches.  To this day, Mr. Nuñez Euceda suffers from night terrors and panic attacks, and he experiences disorientation including losing a sense of time when he tries to think about the events that occurred over that horrific month spent in Texas.

Gibson, Dunn &
Crutcher LLP

I.   **The Separation of Mr. Nuñez Eueda from His Children Was Unlawful and Done to Coerce Him into Abandoning Legitimate Immigration Claims**

56.   There was no legitimate reason for the government to separate Mr. Nuñez Euceda from his minor children.  That practice, which has been inflicted on thousands of parents and children, was done purely to intimidate and dissuade them from pursuing legitimate immigration claims, as is their right.

57.   Indeed, in *Ms. L.*, Judge Sabraw addressed the family-separation practices that Mr. Nuñez Euceda and his children were subject to.  He agreed with the plaintiffs that these parents were the "victims of a wide-spread government practice" for "no legitimate reason." *Ms. L. v. U.S. Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149, 1165 (S.D. Cal. 2018).  Similarly, another federal court concluded that "nothing in federal law suggests that deterring immigration by indefinitely separating families once parents have been transferred to immigration custody is a compelling or legitimate government objective." *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 121 (D.D.C. 2018).

58.   Federal officers have a duty: (i) not to separate immigrant families that are arrested together, *Ms. L.*, 310 F. Supp. 3d at 1142–46 (evidence regarding family separation was sufficient to show likelihood of success regarding claim that the government's practice violates substantive due process rights to family integrity under the Fifth Amendment); *see also* U.S. Const. amend. V; The Refugee Act, Pub. L. No. 96-212, 94 Stat. 102 (1980) (codifying procedures related to asylum); (ii) to prioritize the release of minors to family members, 8 C.F.R. § 1236.3(b); (iii) to permit detained parents to contact family members who were arrested with them, *Ms. L.*, 310 F. Supp. 3d at 1144–45, 1149–50; and (iv) to ensure the prompt release of minors held in immigration custody, *see* 8 U.S.C. § 1232(c); *see also* United Nations High Commissioner for Refugees, *Detention Guidelines: Guidelines on the Applicable Criteria and Standards Relating to the Detention of Asylum-Seekers and Alternatives to Detention* 34 (2012), http://www.unhcr.org/505b10ee9.html (children should as a general matter "not be detained at all").  The government officers that interacted with

Mr. Nuñez Euceda and his children violated each and every one of these obligations.

59. The well-established duty of federal officials is to ensure, whenever possible, that family unity is preserved and that minors are promptly released when they are held in immigration custody. *See Flores v. Reno*, No. 2:85-cv-4544, Dkt. No. 177 at 5–6, 24 (C.D. Cal. July 24, 2015); *United States v. Wolf Child*, 699 F.3d 1082, 1092 (9th Cir. 2012) ("Interference with" the "fundamental right to familial association" "requires 'a powerful countervailing interest.'" (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981))); *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1310–11 (9th Cir. 1982) (requiring compelling interest to deprive parents of their "fundamental right" to "live with their children"). The government's family-separation policy did not just de-prioritize family unity—it intentionally tore families apart with a goal of traumatizing them.

60. The government agents that separated Mr. Nuñez Euceda from his children had no reason to believe he was an unfit parent or otherwise a danger to the children. As a result, separating Mr. Nuñez Euceda from his children, and then keeping them in government custody for many months, violated the government's non-discretionary obligations. The government further violated its duty to provide basic medical care for children under its care by not providing Mr. Nuñez Euceda's daughter with the appropriate medical devices for her hearing. *Cf.* Office of Refugee Resettlement, *Health and Safety*, Dep't of Health & Human Servs. (May 3, 2019), https://www.acf.hhs.gov/orr/about/ucs/health-and-safety ("While children are in ORR custody, the federal government is responsible for their medical care.").

61. But that's not all. The separation of Mr. Nuñez Euceda from his children violated the more basic and constitutional right to family integrity. The Supreme Court has consistently recognized that the parent-child relationship is constitutionally protected, *see Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 231–33 (1972)) *and Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923), and that it is vitally important for children to remain with their parents, *see*

*Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").

62.    Judge Sabraw also concluded in *Ms. L.* that the family-separation policy that Mr. Nuñez Euceda and his children were subject to likely violated parents' and children's due-process rights.  310 F. Supp. 3d at 1144–46 ("A practice of this sort implemented in this way is likely to be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience,' . . . interferes with rights 'implicit in the concept of ordered liberty[,]' . . . and is so 'brutal and offensive that it [does] not comport with traditional ideas of fair play and decency.'" (internal quotation marks omitted and cleaned up)); *see also C.M. v. United States*, 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020) (finding plaintiffs in a family-separation case had "plausibly alleged that the government's separation of their families violated their constitutional rights").

63.    The separation of Mr. Nuñez Euceda from his children was additionally unconstitutional because it was motivated by discriminatory animus towards Latino immigrants of Central American origin.  *See State of Washington v. United States*, 2:18-cv-00939, Dkt. 1 (Complaint) ¶ 355 (W.D. Wash. June 26, 2018) (alleging the forcible-separation policy is "unconstitutional because it disparately impacts immigrants from Latin America" and "is motivated by animus and a desire to harm this particular group").  Central American asylum seekers, like Mr. Nuñez Euceda, were particularly targeted for separation in order to deter them from pursuing legitimate immigration claims.  In fact, multiple government officials stated publicly that the purpose of family separation was to deter Central American families from seeking

asylum in the United States.[11]

64.     In addition, federal officials also separated Mr. Nuñez Euceda from his children to impede his desire to pursue protection under United States immigration law in violation of his due-process rights. *Ms. L.*, 302 F. Supp. 3d 1149, 1166–67 (S.D. Cal. 2018) (denying the government's motion to dismiss plaintiffs' due-process claim on the grounds that the government was using separation as a way to deter lawful asylum seekers).  It is a common and long-standing government tactic to pressure immigrant parents into giving up their immigration cases by demoralizing them and convincing them to abandon their claims for asylum. *See, e.g.*, *Lopez Venegas v. Napolitano*, No. 2:13-cv-03972, Dkt. 1 (Complaint) ¶¶ 57–60 (C.D. Cal. June 4, 2013); *see also Doe v. Johnson*, No. 4:15-cv-00250, Dkt. 1 (Complaint) ¶¶ 111, 171 & n.47 (D. Ariz. June 8, 2015).[12]

65.     In this case, immigration officers separated Mr. Nuñez Euceda from his children and then attempted to get him to sign forms in English that he could not understand.  On information and belief, Mr. Nuñez Euceda suspects these officers did this in an attempt to pressure Mr. Nuñez Euceda to sign away his rights and therefore avoid being permanently separated from his children.  Mr. Nuñez Euceda believed that officials were trying to coerce him into not contesting his deportation in exchange for reunification with his children and deportation of the entire family together.

66.     Relying on family separation to coerce asylum seekers into giving up immigration claims is a violation of existing regulations and a breach of the United States' non-discretionary legal obligations. *See* 8 C.F.R. § 235.4 (an immigrant's

---

[11] *See* Shepardson, *supra* n.10; *see also Sessions Admits Policy Is a Deterrent*, CNN (June 19, 2018), https://www.cnn.com/videos/politics/2018/06/19/sessions-defends-controversial-immigration-policy-deterrent-sot.cnn.

[12] *See also "You Don't Have Rights Here": US Border Screening and Returns of Central Americans to Risk of Serious Harm*, Human Rights Watch (Oct. 16, 2014), https://www.hrw.org/report/2014/10/16/you-dont-have-rights-here/us-border-screening-and-returns-central-americans-risk (outlining the government's "aggressive deterrence strategy" for immigrants entering the United States).

"decision to withdraw his or her application for admission must be made voluntarily"); *see also Ms. L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d 853, 863 (S.D. Cal. 2019) (finding petitioner's choice to withdraw her asylum claim was not voluntary because "she made her decision as a result of the continued separation from her child").

## COUNT I

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

67.     Paragraphs 1 to 66 of this complaint are incorporated as if set forth herein.

68.     By engaging in the acts described above, federal officials and agents, at the direction of the United States, engaged in extreme and outrageous conduct with the intent to cause, or with reckless disregard for the probability of causing, Mr. Nuñez Euceda to suffer severe emotional distress as a result of being separated from his children and the conditions of his confinement.

69.     As a direct and proximate result of the government's conduct, Mr. Nuñez Euceda has in fact suffered and still continues to suffer severe emotional distress.

70.     Under the FTCA, the United States is liable to Mr. Nuñez Euceda for intentional infliction of emotional distress.

## COUNT II

## NEGLIGENCE

71.     Paragraphs 1 to 66 of this complaint are incorporated as if set forth herein.

72.     The federal officials referenced above had a duty to Mr. Nuñez Euceda to act with ordinary care so as not to cause harm or injury to Mr. Nuñez Euceda.

73.     By engaging in the acts alleged herein, federal officials, at the direction of the United States, failed to act with ordinary care and also breached their duty of care to Mr. Nuñez Euceda.

74.     As a direct and proximate result of the above-referenced conduct, Mr. Nuñez Euceda suffered substantial damages.

75.     Under the FTCA, the United States is liable to Mr. Nuñez Euceda for

Gibson, Dunn &
Crutcher LLP

16

negligence.

## COUNT III

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

76.     Paragraphs 1 to 66 of this complaint are incorporated as if set forth herein.

77.     By engaging in the acts described above, federal officials and agents, at the direction of the United States, engaged in negligent and grossly negligent conduct which caused Mr. Nuñez Euceda to suffer severe emotional distress as a result of being separated from his children and the conditions of his confinement.

78.     The federal officials referenced above had a duty to Mr. Nuñez Euceda to act with ordinary care so as not to cause harm or injury to Mr. Nuñez Euceda.

79.     By engaging in the acts alleged herein, federal officials, at the direction of the United States, failed to act with ordinary care and also breached their duty of care to Mr. Nuñez Euceda.

80.     As a direct and proximate result of the government's conduct, Mr. Nuñez Euceda has in fact suffered and still continues to suffer severe emotional distress.

81.     Under the FTCA, the United States is liable to Mr. Nuñez Euceda for negligent infliction of emotional distress.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues raised by the Complaint under Rule 38(b) of the Federal Rules of Civil Procedure.

Gibson, Dunn &
Crutcher LLP

COMPLAINT

# PRAYER FOR RELIEF

**Wherefore**, Plaintiff Mr. Nuñez Euceda respectfully requests:

(1)    Compensatory damages;

(2)    Attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(3)    Any further relief that the Court deems appropriate.


Dated: November 25, 2020                    Respectfully submitted,

**GIBSON, DUNN & CRUTCHER LLP**

By:   /s/ *Marcellus McRae*

Marcellus McRae, SBN 140308
mmcrae@gibsondunn.com
Abiel Garcia, SBN 289052
agarcia@gibsondunn.com
Daniel M. Rubin, SBN 319962
drubin@gibsondunn.com
Caroline K. Monroy, SBN 329018
cmonroy@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071
Telephone:  213.229.7000
Facsimile:   213.229.7520

Attorneys for Plaintiff
Oscar Enrique Nuñez Euceda